1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

3

4   WANGSON BIOTECHNOLOGY
    GROUP, INC., a California corporation,

5                    Plaintiff,

6      v.

7   TAN TAN TRADING CO., Inc. a
    California corporation, *et al.*,

8                    Defendants.

9   _____

No.  C 08-04212 SBA

**ORDER**

[Docket No. 2]

10

11                              **INTRODUCTION**

12          Before the Court is plaintiff's Ex Parte Motion for Temporary Restraining Order, Seizure

13   Order, Order Accelerating Discovery, and Order to Show Cause for Preliminary Injunction (the

14   "Motion") [Docket No. 2].  Plaintiff Wangson Biotechnology Group, Inc. ("Wangson")

15   manufacturers and distributes vitamins, mineral supplements, and dietary supplements, including

16   Liveren G ("LG"), a liver supplement, and Pentagyn, a heart supplement.  Defendants Tan Tan

17   Trading Co., Inc. ("Tan Tan") and Cathay Chinese Herbs are business entities which allegedly sell

18   legitimate as well as counterfeit LG and Pentagyn.  Wangson has sued defendants for trademark

19   infringement under 15 U.S.C. § 1114(1), false designation of origin under 15 U.S.C. § 1125(a),

20   trademark infringement and unfair competition under California law, including section 17200 of the

21   California Business and Professions Code, and for common law trademark infringement and unfair

22   competition.

23          Wangson seeks four remedies from the Court.  First, under 15 U.S.C. § 1116(d), predicated

24   on its claim under 15 U.S.C. § 1114(1), Wangson requests an ex parte seizure order, directing the

25   U.S. Marshal to seize defendants' counterfeit LG and Pentagyn and their financial records.  Second,

26   under 15 U.S.C. § 1116(a), Federal Rule of Civil Procedure 65, and Civil Local Rule 65-1, Wangson

27   requests an ex parte temporary restraining order ("TRO") preventing defendants from

28   manufacturing, distributing, supplying, selling, or offering for sale counterfeit LG and Pentagyn, and

from discussing this suit with their suppliers or distributors.  Third, under the Court's general discovery powers, Wangson requests leave to take immediate discovery to identify defendants' suppliers of counterfeit LG and Pentagyn.  Finally, under § 1116(a), Rule 65, and Local Rule 65-1, Wangson requests an order to show cause ("OSC") hearing regarding issuing a preliminary injunction preventing the conduct barred by the requested TRO.  For the reasons discussed below, the Court DENIES the request for a TRO, DENIES the request for a seizure order, DENIES the request for leave to take immediate discovery, but GRANTS the request for an OSC hearing regarding issuing a preliminary injunction.

## BACKGROUND

Wangson alleges it has exclusive trademark rights and control over "Wangson," "Pentagyn," "Liveren G," and two sets of three Mandarin characters each, pei de yuan (abundant gain source) and pan da kang (climb reach well-being).  Docket No. 3 (Mem. in Support of Mot.) at 1-3. Wangson alleges it and the marks' predecessor-in-interest have continuously used these marks since the late 1990s, and "Wangson" is registered in the United States.  *Id.* at 1-3.  Wangson alleges they have used these marks in distinctive and original packaging designs to distribute, market, and sell LG and Pentagyn.  *Id.* at 3-4.  Wangson alleges by their use of these marks and designs, they have become distinctive symbols of Wangson's goodwill and acquired a secondary meaning for purchasers.  *Id.* at 4-5.

In July 2008, Wangson received complaints from retail customers that defendants were selling counterfeit LG and Pentagyn.  *Id.* at 5.  Customers allegedly noticed a difference in price as well as in the supplements' color and appearance.  *Id.*  This same month, a longtime retailer, Chun Chou City ("Chun"), in San Francisco, next to Tan Tan, allegedly complained to Wangson that it was losing business to Tan Tan, as it was selling LG and Pentagyn at below Chun's wholesale price. *Id.*  Chun allegedly believed Wangson had sold to Tan Tan at this price and threatened to stop selling Wangson's products.  *Id.*

In July and August 2008 Wangson investigated by having agents purchase LG and Pentagyn from defendants.  *Id.* at 5-6.  It found the price was anywhere from 25 to 50 percent lower than its suggested retail price.  *Id.* at 6.  It also found while about 25 percent of its purchases were legitimate

products, the remainder were not.  *Id.* at 5-6.  The counterfeit supplements differed in color and opacity, and came in packaging almost but not quite identical to Wangson's.  *Id.*  On September 5, 2008, Wangson filed this suit.  *See* Docket No. 1.

## LEGAL STANDARD

### I.    Ex Parte Seizure Orders under 15 U.S.C. § 1116

Predicated on its claim under 15 U.S.C. § 1114(a), Wangson has requested an ex parte seizure order under 15 U.S.C. § 1116(d).  Section 1116(d)(1)(A) provides that in counterfeit trademark cases arising under 15 U.S.C. § 1114(1)(a), a court may issue an ex parte injunction "providing for the seizure of goods and counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation."  15 U.S.C. § 1116(d)(1)(A); *Vuitton v. White*, 945 F.2d 569, 572 (3d Cir. 1991).  "The purpose of the ex parte seizure provision is to provide victims of trademark counterfeiting with a means of ensuring that the courts are able to exercise their jurisdiction effectively in counterfeiting cases."  *Vuitton*, 945 F.2d at 575 (*quoting* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, H12080 (1984) ("Joint Statement")).  The courts are only to issue such orders where there is no other means by which to prevent those who deal in counterfeits from destroying or transferring evidence.  *Id.*  Although Congress created § 1116(d) by borrowing elements from Rule 65, § 1116(d) provides the *exclusive* procedure for obtaining an ex parte seizure order, when a party asserts a claim under § 1114(1)(a).  *See Vuitton*, 945 F.2d at 572-74, *Major League Baseball Props., Inc. v. Crump*, 11 U.S.P.Q.2d 1381 (D. Minn. 1989).

To obtain an ex parte seizure order, a party must meet a number of requirements under § 1116(d).  Under § 1116(d)(2), the movant must address whether the local United States attorney should received notice.

> The court *shall not* receive an application under this subsection unless the applicant has given such notice of the application as is reasonable under the circumstances to the United States attorney for the judicial district in which such order is sought.  Such attorney may participate in the proceedings arising under such application if such proceedings may affect evidence of an offense against the United

1  States. The court may deny such application if the court determines that the public

2  interest in a potential prosecution so requires.

3  15 U.S.C. § 1116(d)(2) (emphasis added).

4  In addition, the application "shall--(A) be based on an affidavit or the verified complaint

5  establishing facts sufficient to support the findings of fact and conclusions of law required for such

6  order; and (B) contain the" following information for use in the court's order: (1) findings of fact

7  and conclusions of law; (2) a description of the matter to be seized and its location; (3) the seizure

8  date; (4) the security required; and (5) the post-seizure hearing date. *Id.* § 1116(d)(3), (d)(5).

9  Further, "[t]he court shall not grant such an application unless--" the applicant posts adequate

10  security as a court determines; and "the court finds that it clearly appears from specific facts that":

11  (1) only an ex parte seizure order will achieve the purposes of § 1114; (2) the applicant has not

12  publicized the requested seizure; (3) the applicant is likely to succeed in showing the person against

13  whom seizure would be ordered used a counterfeit mark in violation of § 1114; (4) an immediate

14  and irreparable injury will occur if such seizure is not ordered; (5) the matter to be seized will be

15  located at the place identified in the application; (6) the harm to the applicant of denying the

16  application outweighs the harm to the legitimate interests of the person against whom seizure would

17  be ordered of granting the application; and (7) the person against whom seizure would be ordered, or

18  persons acting in concert with such person, would destroy, move, hide, or otherwise make such

19  matter inaccessible to the court, if the applicant were to proceed on notice to such person. *Id.*

20  § 1116(d)(4); *Vuitton*, 945 F.2d at 574 n.5.

21  **II.      Notice Requirements for Temporary Restraining Orders**

22  Section 1116(a) of Title 15 states:

23  The several courts vested with jurisdiction of civil actions arising under this

24  chapter shall have power to grant injunctions, according to the principles of equity

25  and upon such terms as the court may deem reasonable, to prevent the violation of

26  any right of the registrant of a mark registered in the Patent and Trademark Office or

27  to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title.

28  15 U.S.C. § 1116(a).

4

Section 1116(a) *authorizes* injunctions to enforce claims brought under the Lanham Act of 1946, 15 U.S.C. § 1051 *et seq.*, including under § 1114(1) or § 1125(a), but Rule 65(b) governs the *process. See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1128-29 (9th Cir. 2006). Under Local Rule 65-1(b), "[u]nless relieved by order of a Judge for good cause shown, on or before the day of an *ex parte* motion for a temporary restraining order, counsel applying for the temporary restraining order must deliver notice of such motion to opposing counsel or party." N.D. Cal. Civ. R. 65-1(b). Rule 65(b) further specifies the conditions for an *ex parte* TRO, stating:

> (1)    Issuing Without Notice. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney *only* if:
>
> (A)    specific facts in an affidavit or a verified complaint *clearly show* that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B)    the movant's attorney certifies in writing any *efforts* made to give notice and the *reasons* why it should not be required.

Fed. R. Civ. P. 65(b) (emphasis added); *see Reno*, 452 F.3d at 1130-31.

As the Supreme Court has noted, the burden to obtain an ex parte TRO is quite heavy, as they are generally disfavored:

> The stringent restrictions imposed . . . by Rule 65 on the availability of ex parte temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute. Ex parte temporary restraining orders are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.

*Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974) (internal citation omitted).

///

///

5

# ANALYSIS

**I.      Wangson has not made a sufficient showing for an ex parte seizure order.**

Predicated on its claim under 15 U.S.C. § 1114(a), Wangson has requested a seizure order under 15 U.S.C. § 1116(d).  Wangson, however, has failed to comply with the necessary prerequisites.  Preliminarily, Wangson did not notify the United States Attorney for the Northern District of California, contending that its "application does not affect evidence of offense against the United States."  Mot. at 4:15-17.  Inconsistently, however, Wangson repeatedly asserts that defendants have engaged in criminal counterfeiting.  Mem. at 16:24-25, 17:22-23, 18:28.  More troubling is Wangson's assertion that "[t]here is a very high likelihood of serious health damage to consumers because of Defendants' untested and unknown counterfeit supplements."  Mem. at 15:13-14.  Wangson's conclusion that defendants' conduct presents a public health risk, militates against its decision dispensing with notice to the United States attorney.

In addition, Wangson failed to meet all seven elements of § 1116(d)(4).  Given that the elements are conjunctive, *see Vuitton*, 945 F.2d at 575, the Court need not address the first six elements, because Wangson clearly failed to meet its burden on the seventh, addressing the destruction of evidence.  Wangson attempts to make the required showing by alleging:

> Defendants have intentionally and knowingly taken advantage of Plaintiffs established market presence and consumer base to sell its untested counterfeit supplements using Plaintiffs well known Wangson Marks.  If an ex parte seizure order does not issue, Defendants will be put on notice that their counterfeiting scheme has been identified and they will undoubtedly destroy all evidence of any illegal counterfeiting activity, especially in light of the fact that counterfeiting is a federal crime.  Here, the counterfeiting products involved are supplements which would be easy for Defendants to destroy or hide.  In the absence of an ex parte seizure order, Plaintiff will be denied its chance to gather actual evidence of counterfeiting.

Mem. at 16:21-27.

The Court first notes that Wangson filed five declarations and almost a half-inch of exhibits

with the Motion.  Nowhere, does any Wangson agent or witness declare any of these allegations regarding defendants' mens rea or possible response to suit.  Nor are these allegations found in its complaint, which even if they were, Wangson did not verify.[1]  Section 1116(d)(3), (d)(4), and (d)(5) require the Court make findings of fact based on a movant's affidavits or verified complaint.  Wangson has not met its evidentiary burden.  Given Wangson's assertions, and in the absence of affidavits or allegations in a verified complaint which demonstrates the contrary, it is equally plausible that defendants may be unwitting purchasers from deceptive sellers, rather than intentional re-sellers of counterfeit products.  If so, contrary to Wangson's assertions, they would have an incentive to preserve any counterfeit supplements, in order to obtain restitution.

Wangson provides no support for its conclusion that defendants will "undoubtedly" destroy evidence upon receiving notice of this suit, ostensibly suggesting that an ex parte seizure order should issue on the mere showing of the possible criminal possession of counterfeit goods.  Courts have held, however, that the mere allegation a defendant is engaged in criminal counterfeiting, and thus has an *incentive* to destroy evidence, without more, is insufficient to support granting an ex parte request for a seizure order.  *Lorillard Tobacco Co. v. Bisan Food Corp.*, 377 F.3d 313, 321-22 (3d Cir. 2004).  Were the courts to hold otherwise, ex parte seizure orders would become automatic in all counterfeiting litigations.  *Id.*

Moreover, in *Vuitton v. White*, the Second Circuit held an ex parte seizure order would be appropriate where professional street vendors admitted to knowingly selling counterfeit goods, failed to appear at earlier enforcement hearings despite actual notice, and subsequently violated a permanent injunction.  *Vuitton*, 945 F.2d at 570, 575.  Here, Wangson has made no showing of this nature, nor has it provided any evidence that defendants are predisposed to destroy evidence upon notice of suit.

---

[1]      For federal verification, district courts look to local state law.  *U.S. v. $84,740.00*, 900 F.2d 1402, 1404-05 (9th Cir. 1990) (discussing section 446(a) of the California Code of Civil Procedure), *overruled on other grounds by U.S. v. 22 Santa Barbara Dr.*, 264 F.3d 860, 867 (9th Cir. 2001).  Under section 446(a) of the California Code of Civil Procedure, "[i]n all cases of a verification of a pleading, the affidavit of the party shall state that the same is true of his own knowledge, except as to the matters which are therein stated on his or her information or belief . . . ."  Cal. Civ. Proc. Code § 446(a).

1   ///

2          Lastly, ex parte seizure orders against established ongoing businesses are disfavored.  As the

3   Third Circuit has noted "incorporated businesses with inventories, assets, and a fixed physical

4   presence-have much to lose if held in contempt."  *Lorillard*, 377 F.3d at 321.  In contrast, itinerant

5   street vendors with few assets and "fly by night defendants" are the intended target of § 1116(d).

6   *Lorillard*, 377 F.3d at 321; Joint Statement, 130 Cong. Rec. at H12081.  Here, Wangson seeks to

7   seize the inventories of two established commercial enterprises, without satisfying its burden under

8   § 1116(d).  For the foregoing reasons, the Court DENIES Wangson's request for an ex parte seizure

9   order under 15 U.S.C. § 1116(d).

10   **II.      Wangson has not made a sufficient showing for a TRO.**

11          Wangson has requested a TRO under 15 U.S.C. § 1116(a).  To obtain one, it must comply

12   with the requirements of Rule 65(b)(1).  Here, Wangson fails to do so for two reasons.  First,

13   Wangson fails to provide "specific facts in an affidavit or a verified complaint [which] clearly show

14   that immediate and irreparable injury, loss, or damage will result to the movant before the adverse

15   party can be heard in opposition[.]"  In *Reno Air Racing Ass'n, Inc. v. McCord*, plaintiffs suing

16   under 15 U.S.C. § 1114(1) and § 1125(a), obtained a TRO barring the defendant from "making,

17   manufacturing, using, distributing, shipping, licensing, selling, developing, displaying, delivering,

18   advertising and/or otherwise marketing or disposing of any goods, packaging or any other items

19   which bear the trademarks [at issue.]"  452 F.3d at 1129.  The TRO also barred any movement or

20   destruction of any goods with the subject trademarks, the means for making such goods, or

21   documents pertaining to their creation.  *Id.*  The Ninth Circuit held to justify an ex parte TRO on the

22   grounds the alleged infringer is likely to dispose of the infringing goods before the hearing, "the

23   applicant must do more than assert that the adverse party would dispose of evidence if given notice."

24   *Id.* at 1131 (*quoting First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993)).

25          [P]laintiffs must show that defendants would have disregarded a direct court order

26          and disposed of the goods within the time it would take for a hearing . . . [and] must

27          support such assertions by showing that the adverse party has a history of disposing

28          of

1   ///

2   ///

3       evidence or violating court orders or that persons similar to the adverse party have

4       such a history.

5   *Reno*, 452 F.3d at 1131 (*quoting First Tech.*, 11 F.3d at 650-51).

6   Likewise, the *Reno* court held, a TRO should not issue solely on the unsupported allegations the

7   seller would flee the area and/or dispose of the alleged counterfeit goods, especially where plaintiffs

8   knew the seller had sold the products in question in the Reno area for years.  *Reno*, 452 F.3d. 1133.

9   To hold otherwise, the Court stated, would make ex parte TROs the norm, not the exception.  *Id.*

10      Here, Wangson has merely "assert[ed] that the adverse party would dispose of evidence if

11  given notice."  *Reno*, 452 F.3d at 1131 (*quoting First Tech.*, 11 F.3d at 650).  Not only has Wangson

12  failed to provide any affirmed or verified testimony to the Court, its bare unsupported allegations do

13  not meet the *Reno* standard for issuing a TRO under Rule 65(b)(1).  As the Ninth Circuit warned in

14  *Reno*, were this Court to hold otherwise, ex parte TROs would become the norm.

15      In addition to its evidentiary shortcomings, the Court finds Wangson's delay in requesting a

16  TRO militates against its issuance.  Parties spurred on by the threat of or actual immediate

17  irreparable harm, file for TROs as quickly as possible to head or stave it off.  *See, e.g.*, *In re Excel*

18  *Innovations, Inc.*, 502 F.3d 1086, 1091 (9th Cir. 2007) (zero days delay); *Lands Council v. Martin*,

19  479 F.3d 636, 638-39 (9th Cir. 2007) (one day delay); *Earth Island Inst. v. U.S. Forest Serv.*, 442

20  F.3d 1147, 1155-56 (9th Cir. 2006) (ten days delay); *Ranchers Cattlemen Action Legal Fund United*

21  *Stockgrowers of Am. v. U.S.D.A.*, 415 F.3d 1078, 1089 (9th Cir. 2005) (six days delay); *Duke Energy*

22  *Trading and Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1048 (9th Cir. 2001) (two days delay).  Here, in

23  stark contrast, Wangson was aware of defendants' alleged counterfeiting activities since July 2008,

24  but did not file suit until September 2008.  Thus, because of Wangson's delay and because it has

25  failed to provide any evidence defendants would be unresponsive to any remedies issued after a

26  noticed proceeding, the Court DENIES Wangson's request for a TRO under Rule 65(b)(1).

27  **III.    Wangson has not made a sufficient showing for ex parte leave to take immediate**

28          **discovery.**

9

1    In the Ninth Circuit, courts use the "good cause" standard to determine whether discovery

2  should be allowed to proceed prior to a Rule 26(f) conference.  Good cause may be found where the

3  need for expedited discovery, in consideration of the administration of justice, outweighs the

4  prejudice to the responding party.  *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276

5  (N.D. Cal. 2002); *UMG Recordings, Inc. v. Doe*, slip op., no. C 08-1193 SBA, 2008 WL 4104214,

6  *4 & n.3 (N.D. Cal. Sep. 3, 2008) (listing cases from Ninth and other circuits citing *Semitool*).  "It

7  should be noted that courts have recognized that good cause is frequently found in cases involving

8  claims of infringement and unfair competition."  *Semitool*, 108 F.R.D. at 276.

9    In this case, however, Wangson has not shown good cause for *ex parte* leave.  Wangson

10  alleges:

11    It is unreasonable to believe that the various manufacturers, distributors, and

12    suppliers of the counterfeit Liveren G and Pentagyn supplements will maintain status

13    quo and retain all the evidence of their illegal activities particularly when

14    counterfeiting is a federal offense.  In all likelihood, the Defendants will simply

15    destroy or hide all the counterfeit Liveren G and Pentagyn supplements, leaving the

16    Plaintiffs with no evidence to prove their case.

17  Mem. at 18:26-19:2.

18    Wangson does not direct the Court to any legal authority which provides the district courts

19  should *presume* witnesses will destroy evidence, merely because they are *allegedly* engaged in an

20  activity which *might* give rise to criminal charges.  As discussed in parts I and II, *supra*, Wangson

21  has again advanced a legal standard applicable to all trademark infringement cases.  While

22  infringement cases often allow for expedited discovery, movants are expected to provide evidence

23  supporting their need, such as a custodian's practice of destroying records, *see UMG*, 2008 WL

24  4104214 at *5, discovery is needed to identify a Doe defendant for service, *see id.*, spoilage or

25  destruction will occur in the due course of business activities, *Monsanto Co. v. Woods*, 250 F.R.D.

26  411, 412-14 (E.D. Mo. 2008), or the evidence at issue is set for sale and distribution to consumers,

27  *Pod-Ners, LLC v. N. Feed & Bean of Lucerne Ltd. Liability Co.*, 204 F.R.D. 675, 675-76 (D. Colo.

28  2002).  Here, Wangson makes none of these showings nor anything similar.  Thus, it has not made a

10

1   sufficient showing for ex parte leave to take immediate discovery.  Nonetheless, the Court will

2   ///

3   reconsider this issue, after defendants have had the opportunity to brief this issue and the Court has

4   ruled on Wangson's request for a preliminary injunction.

5   **IV.     Wangson's request for a preliminary injunction.**

6          Although Wangson is not entitled to ex parte relief or expedited discovery, given its

7   declarations, which raise rather serious allegations of counterfeiting, the Court will issue an

8   evidence preservation order and set an expedited briefing schedule for a hearing regarding

9   Wangson's request for a preliminary injunction.

10                                          **CONCLUSION**

11          Accordingly, the Court GRANTS in part and DENIES in part Wangson's Ex Parte Motion

12   for Temporary Restraining Order, Seizure Order, Order Accelerating Discovery, and Order to Show

13   Cause for Preliminary Injunction [Docket No. 2].  Specifically:

14          (1)     The Court DENIES Wangson's request for an ex parte TRO preventing defendants

15   from manufacturing, distributing, supplying, selling, or offering for sale counterfeit LG and

16   Pentagyn, and from discussing this suit with their supplier or distributor of the same.

17          (2)     The Court DENIES Wangson's request for an order directing the U.S. Marshal to

18   seize defendants' counterfeit LG and Pentagyn and their financial records.

19          (3)     The Court DENIES Wangson's request for leave to take immediate discovery to

20   identify defendants' suppliers of counterfeit LG and Pentagyn.

21          (4)     The Court GRANTS Wangson's request to set an OSC hearing regarding issuing a

22   preliminary injunction preventing defendants from manufacturing, distributing, supplying, selling, or

23   offering for sale counterfeit LG and Pentagyn.  The Court ORDERS Wangson to hand-serve copies

24   of all pleadings and evidence it has filed in this matter on defendants by Friday, September 12, 2008,

25   and provide proofs of service to the Court by September 16, 2008.  Defendants may file any

26   opposition to the requested preliminary injunction by September 22, 2008.  Wangson may file a

27   reply by September 29, 2008.  A hearing will be scheduled for October 7, 2008, at 1:00 p.m.  If

28   Wangson does not hand-serve the papers as directed, it may instead notice a motion for a

1   preliminary injunction for the next available hearing date.

2   ///

3            (5)     The Court ORDERS defendants Tan Tan Trading Co., Inc. and Cathay Chinese

4   Herbs to take reasonable steps to preserve *any and all records or documents*, as defined in Federal

5   Rule of Civil Procedure 34(a)(1)(A), including but not limited to sales and customer journals,

6   notebooks, bank records, receipts, recordings, telephone records, voice mails, e-mails, or

7   correspondence, regardless of storage or retention medium or method, relating to the manufacture,

8   distribution, promotion, sale, offer to sale, purchase, offer to purchase, transfer, shipping, or

9   transportation of the following Wangson products, in their possession, custody, or control, whether

10  apparently legitimate or counterfeit:  Liveren G, Pentagyn, and Pentagyn II.

11

12          IT IS SO ORDERED.

13

14          September 11, 2008

Saundra Brown Armstrong
United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28